Filed 3/18/22  P. v. Morales CA2/7
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B253249 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA098830) |
| v. | |
| CARLOS NUMBERTO MORALES et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of Los Angeles County, Bruce F. Marrs, Judge.  Jojola's and Sanchez's judgments are reversed in part and affirmed in part and remanded with directions.

Sharon Fleming; and Christopher Nalls, under appointment by the Court of Appeal, for Defendant and Appellant Phillip Joseph Jojola.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant Robert Epifano Sanchez.

Rob Bonta, Xavier Becerra and Kamala D. Harris, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, Idan Ivri, Victoria B. Wilson, Mark E. Weber, David F. Glassman, David Wildman, Amanda V. Lopez and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Phillip Joseph Jojola and Robert Epifano Sanchez were convicted of conspiracy to commit murder, attempted willful, deliberate and premeditated murder, attempted extortion and false imprisonment with true findings the crimes were committed to benefit a criminal street gang.  In prior opinions we explained their conspiracy convictions must be reversed because of error in the jury instructions.  Jojola and Sanchez now argue, the Attorney General concedes, and we agree that the attempted murder convictions, as well as the criminal street gang enhancements, must be reversed because of recent ameliorative legislation that applies to their case.

## PROCEDURAL BACKGROUND

Jojola, Sanchez, Arthur John Quesada and Carlos Numberto Morales, all members of the same criminal street gang, attempted to extort money from Andres Vargas by threatening to harm him if he did not pay them $300.  After Vargas did not pay, Morales shot Vargas multiple times, seriously injuring him.

A jury convicted all four men of conspiracy to commit murder (Pen. Code, § 182, subd. (a)(1));[1] attempted willful, deliberate and premeditated murder (§§ 187, subd. (a), 664, subd. (a)); attempted extortion (§ 524); and false imprisonment. The jury found true criminal street gang enhancement allegations on all counts (§ 186.22, subd. (b)) and firearm-use enhancement allegations on the conspiracy and attempted murder counts (§ 12022.53, subdivisions (d) and (e)(1)) against the four defendants, as well as a great bodily injury enhancement allegation (§ 12022.7, subd. (b)) against Morales. The trial court sentenced each defendant to 25 years to life for conspiracy to commit murder, plus 25 years to life for the firearm-use enhancement, and stayed the sentence on the remaining counts pursuant to section 654.

In a nonpublished opinion filed in February 2016 we affirmed the judgment as to Morales. We reversed Quesada's, Jojola's and Sanchez's convictions for conspiracy to commit murder based on instructional error, but affirmed their convictions for attempted premeditated murder, attempted extortion and false imprisonment, rejecting their arguments there was insufficient evidence to support the convictions on the conspiracy and attempted murder counts and the true findings on the criminal street gang enhancement allegations.

Morales's petition for review was denied by the California Supreme Court on May 25, 2016. The judgment as to him has long-since been final, and he is not a party to this appeal.

Quesada's, Jojola's and Sanchez's petitions for review were granted by the Supreme Court on May 25, 2016, with further action deferred pending consideration in a case already before the

---

[1]     Statutory references are to this code.

Court whether, to convict an aider and abettor of attempted premeditated murder under the natural and probable consequences doctrine, both premeditation and attempted murder must have been reasonably foreseeable by an individual committing the target offense.  Before that case was decided, however, the Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015) (Senate Bill 1437), which substantially modified the law relating to accomplice liability for murder, eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder and significantly narrowing the felony-murder exception to the malice requirement for murder.  (§§ 188, subd. (a)(3), 189, subd. (e); see *People v. Lewis* (2021) 11 Cal.5th 952, 963 (*Lewis*); *People v. Gentile* (2020) 10 Cal.5th 830, 842-843 (*Gentile*).)  The Supreme Court transferred the case to us with directions to vacate our decision and to reconsider it in light of Senate Bill 1437.

In a second nonpublished opinion, filed in September 2019, based on prior decisions from this and other courts of appeal, we rejected Jojola and Sanchez's arguments that, as a matter of either statutory construction or equal protection analysis, enactment of Senate Bill 1437 precluded convictions for attempted murder under the natural and probable consequences doctrine.  Accordingly, we again affirmed Jojola's and Sanchez's convictions for attempted premeditated murder, as well as for attempted extortion and false imprisonment, and reversed their convictions for conspiracy to commit murder.  Because Quesada had died while his petition for review was pending in the Supreme Court, we dismissed his appeal as moot.

Jojola and Sanchez once more petitioned for review in the Supreme Court.  Following another grant-and-hold order, on

4

December 29, 2021 the Court transferred the matter with directions to vacate our decision and reconsider the cause in light of another new piece of legislation, Senate Bill No. 775 (Stats. 2021, ch. 551) (Senate Bill 775), which extended the ameliorative provisions of Senate Bill 1437 to attempted murder and voluntary manslaughter.

In supplemental briefing Jojola and Sanchez contend, in light of Senate Bill 1437 and Senate Bill 775, their convictions for attempted murder under the natural and probable consequences doctrine must be reversed. They also argue, pursuant to Assembly Bill No. 333 (2020-2021 Reg. Sess.) (Stats. 2021, ch. 699) (Assembly Bill 333), which increased the proof requirements for true findings on criminal street gang enhancement allegations under section 186.22, the jury's gang findings and related firearm-use enhancements must also be reversed. The Attorney General essentially agrees with Jojola and Sanchez and requests that we reverse the attempted murder convictions and remand the matter to provide the prosecution an opportunity, if it wishes to do so, to retry the attempted murder charges and gang enhancement allegations on legally viable theories.

## FACTUAL BACKGROUND

The evidence at trial established that Jojola, Sanchez, Morales and Quesada were members of the 18th Street gang. Vargas and his friend Bellanira Figueroa knew Jojola, Sanchez, Morales and Quesada but were not members of their gang. The events leading to the shooting of Vargas occurred over the course of three days in July 2012.

On Friday, July 6, 2012, Vargas and Figueroa went to Quesada's house in Baldwin Park to smoke methamphetamine

with Morales, Quesada, Jojola and Sanchez.  (Quesada's mother owned the house; Jojola lived there with Quesada and others.)  After smoking methamphetamine Morales asked Vargas to take him for a ride in Vargas's car.  Vargas, accompanied by Figueroa, drove Morales to El Monte.  Morales brought with him a wig, a .357 Smith & Wesson revolver and a pillowcase.  Upon arriving in El Monte, Morales got out of Vargas's car, robbed a pizza store, ran back to the car and directed Vargas to drive away.  Morales, Vargas and Figueroa returned to Quesada's house and smoked more methamphetamine with Quesada, Jojola and Sanchez.

Later that night Vargas drove Morales and Figueroa to another pizza store in South El Monte, which Morales robbed.  After the robbery they drove to a house in Monterey Park where Vargas's friend Justin lived so Morales could sell Justin methamphetamine.  Vargas knew, but did not tell Morales, that the house was in a "hot" area—that is, an area the police frequently patrolled.

When they arrived at Justin's house, Justin was not home.  Morales and Vargas went inside to await Justin's return, while Figueroa stayed in Vargas's car.  As they were waiting, a police car drove by; and the officer inside flashed a light on Justin's house.  By text message Figueroa alerted Vargas to the police's presence.  Minutes later, Morales left the house, got into the driver's seat of Vargas's car and drove away with Figueroa, while Vargas remained in the house.

The police officer, who had continued to watch Justin's house, followed Morales in his patrol car.  The officer activated his patrol car's lights to stop Morales for a traffic violation.  Morales refused to comply, leading to a police chase.  Morales successfully avoided the pursuit and returned to Justin's house.

He parked the car nearby and ran away, leaving his cell phone inside the car.

The next evening Vargas and Figueroa drove to Quesada's house to return Morales's cell phone to him. Vargas went inside and returned the phone, while Figueroa waited in the car. Morales, Quesada, Sanchez and Jojola were all in the house at the time. While in Jojola's room Morales and Quesada accused Vargas of "setting [Morales] up" with the police the previous night. They then escorted Vargas to the backyard to continue the discussion. In the backyard Morales and Quesada told Vargas the setup was a sign of disrespect, said Vargas had disrespected not just Morales but all of them, and demanded Vargas pay $300 for his disrespect. Vargas did not have the money with him. Morales got Figueroa from Vargas's car, brought her to the backyard and sat her next to Vargas. Vargas told her the men "were asking him for $300 . . . [b]ecause [Morales] felt disrespected."

Morales and Quesada repeated the demand for $300 and threatened that Vargas needed to get the money "or else." Vargas understood this to be a threat on his life. The threat was accompanied by violence: Quesada struck Vargas with a closed fist to the back of his head and hit Vargas twice more with blows to his forehead. Morales and Quesada told Vargas he could not leave until they got the money and explained Figueroa would have to raise the money for him.

Morales told Figueroa she had until 1:18 a.m. to get the money (a deadline subsequently extended to 3:18 a.m.), and, if she did not, it would be her "ass" too. Quesada told Jojola to walk Figueroa out to Vargas's car. As Jojola walked her out, he told her, "Everything will be okay. Just get the money." Figueroa did

7

not call the police once she left the house because she believed defendants would kill Vargas if she did.

In the early morning hours of July 8, 2012 Figueroa attempted to raise the money for Vargas. During that time Morales dragged Vargas to an area in the back of the house, where Morales and Quesada assaulted Vargas once again, punching and kicking him while he was on the ground.

Throughout the early morning Morales and Jojola continued to follow up with Figueroa about the money. Jojola sent a series of increasingly ominous text messages, warning Figueroa that time was running out. Figueroa was never able to raise the $300.

For the rest of the day Vargas's movements were closely monitored and controlled. Morales took Vargas away from the house several times, using Jojola's car. Each time Morales kept to the same ritual, requiring Vargas to walk in front of him as Morales followed, holding his gun. On the final trip Morales told Vargas he was going to drive him to Vargas's house, but instead took him to a secluded area in the mountains. Morales stopped the car and ordered Vargas to get out. Vargas pleaded with Morales, but Morales insisted Vargas leave the car. As Vargas took his first step out, Morales shot him twice, striking him in the buttocks. Morales then left the car and shot Vargas four more times, striking him in the hip, groin and chest. Vargas survived the shooting, but sustained life-long, debilitating injuries.

During the police investigation into the shooting, Vargas identified Morales, Quesada, Jojola and Sanchez as being involved. Figueroa described the perpetrators in the following manner: (1) Morales was "the main person running the show,"

8

who "was basically taxing [Vargas] the $300"; (2) Quesada was the man who "hit [Vargas] in the face"; (3) Sanchez was the man who "didn't allow [Vargas] to leave"; and (4) Jojola "was the one who was texting and calling" Figueroa.

## DISCUSSION

1. *Senate Bill 775 Requires Reversal of the Convictions for Attempted Murder*

Senate Bill 1437 amended section 188 to provide in subdivision (a)(3) that, except as provided in section 189, subdivision (e), which governs felony murder, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  As amended, section 188, subdivision (a)(3), "bars a conviction for first or second degree murder under a natural and probable consequences theory."  (*Gentile*, *supra*, 10 Cal.5th at p. 846.)

Senate Bill 775, which amended section 1170.95, clarified that individuals convicted of attempted murder under the natural and probable consequences doctrine "are permitted the same relief as those persons convicted of murder under the same theories."  (Senate Bill 775 (Stats. 2021, ch. 551) § 1, subd. (a); see § 1170.95, subd. (a).)  That is, because of Senate Bill 1437's amendments to section 188 barring imputed malice based solely on participation in another crime, an individual can no longer be found guilty of attempted murder under the natural and probable consequences doctrine.  Senate Bill 775 also added section 1170.95, subdivision (g), providing that a person convicted of murder, attempted murder or voluntary manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on Senate Bill 1437's changes to

9

sections 188 and 189.  (Previously, relief under section 1437 was limited to the postjudgment petition process specified in section 1170.95.)

The jury at Jojola and Sanchez's trial was instructed (correctly, at the time) on their potential liability for attempted murder under both a theory of direct aiding and abetting and the natural and probable consequences doctrine.  The prosecutor relied primarily on the latter theory—that Jojola and Sanchez should be convicted of attempted willful, deliberate and premeditated murder because they had aided and abetted the attempted extortion and false imprisonment of Vargas (the target offenses), and Morales's attempted murder of Vargas (the nontarget offense) was the natural and probable consequence of the target offenses.

As the Attorney General explains in his supplemental brief, when a jury has been instructed with both a legally correct theory (direct aiding and abetting) and a now-incorrect legal theory (natural and probable consequences), a conviction must be reversed unless, "after examining the entire cause, including the evidence, and considering all relevant circumstances, [the reviewing court] determines the error was harmless beyond a reasonable doubt."  (*People v. Aledamat* (2019) 8 Cal.5th 1, 13.)  The Attorney General agrees with Jojola and Sanchez, as do we, that the record in this case does not permit us to determine beyond a reasonable doubt that the jury found Jojola and Sanchez guilty of attempted murder based on direct aiding and abetting principles.  To the contrary, it seems evident, based on the evidence concerning the manner in which the murder took place and the nature of Jojola's and Sanchez's involvement in the events of July 6 to 8, 2012, that they were convicted of attempted

murder under the now-invalid natural and probable consequences doctrine.

Because we reverse the attempted murder convictions due to a retroactive change in the law, not for insufficient evidence,[2]

<hr />

[2]    As we explained in our earlier opinions, the evidence supported the inference all four defendants agreed to extort $300 from Vargas for showing disrespect by taking Morales to a "hot" house where there was ongoing police surveillance. Vargas was told his actions were a sign of disrespect not just for Morales but for "all of them"; and the four men appeared to operate in a coordinated manner when they directed Vargas to the backyard of the Quesada house, positioning themselves around him in an intimidating way and demanding he pay them "or else."

Vargas testified he understood "or else" to be a threat on his life, and the jury reasonably could have concluded a mortal threat was implicit in those words. Indeed, after making the threat, the men demonstrated their seriousness by falsely imprisoning Vargas, repeatedly beating him and imposing deadlines (1:18 a.m. and 3:18 a.m.) that suggested gang-style consequences for failure to comply.

Although it was Morales and Quesada who initially demanded the $300 payment, Vargas testified Jojola also said something about the money while he was surrounded in the backyard. According to Figueroa, when she was allowed to leave the house to raise the money, Sanchez told her Vargas could not leave until payment was made. While Figueroa was out, Jojola sent her threatening text messages, using terminology that emphasized this was an 18th Street gang matter.

According to the People's gang expert, if the gang issued an ultimatum to "pay us $300 or else," the gang would follow through with the threat to avoid appearing weak. As gang members, Jojola and Sanchez could be expected to have known this much about gang culture. They also could be expected to

11

retrial remains theoretically possible if the People believe the evidence would support convictions on the still-viable direct aiding and abetting theory.  (See *People v. Chiu* (2014) 59 Cal.4th 155, 168 [allowing the People to retry charge of first degree murder on a direct aiding and abetting theory when jury may have improperly based prior verdict on natural and probable consequences doctrine]; see also *People v. Gutierrez* (2018) 20 Cal.App.5th 847, 857 [permitting new trial on charge of unauthorized taking of an automobile when evidence of value of automobile not introduced at original trial and Supreme Court had not yet ruled on Proposition 47's applicability to Vehicle Code section 10851].)  Accordingly, we remand the case to allow the People to elect whether to retry Jojola and Sanchez (or either of them) as direct aiders and abettors of the attempted murder of Vargas.

### 2. *Assembly Bill 333 Requires Reversal of the True Findings on the Criminal Street Gang Enhancements*

Section 186.22. subdivision (b), provides for enhanced punishment when a defendant is convicted of a felony committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  Assembly Bill 333 made a number of significant modifications to the requirements for proving a criminal street gang enhancement. The Attorney General agrees with Jojola and Sanchez, and we have previously held (see *People v. Delgado* (2022) 74 Cal.App.5th 1067), that, under the principles enunciated in *In re Estrada*

---

have known, based on the evidence in the record, that Morales had a gun ready to use if necessary.

12

(1965) 63 Cal.2d 740, Assembly Bill 333's amendments to section 186.22 apply retroactively to defendants whose convictions are not yet final.  (See also *People v. E.H.* (2022) 75 Cal.App.5th 467.)

Previously, proof of a "pattern of criminal gang activity" as defined by section 186.22, subdivision (e), required evidence of two or more identified predicate offenses, "provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons."  As amended, subdivision (e) now requires proof that (i) the last offense used to show the pattern of criminal gang activity occurred within three years of the date the currently charged offense is alleged to have been committed; (ii) the offenses were committed on separate occasions or by two or more gang members, rather than simply "persons"; (iii) the offenses commonly benefited a criminal street gang, and the common benefit was more than reputational; and (iv) the currently charged offense cannot be used to establish the pattern.

New section 186.22, subdivision (g), provides "to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational."  The new subdivision provides as examples of a common benefit that is more than reputational "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."

Not surprisingly, the gang evidence at Jojola and Sanchez's trial, presented under the old law, fell short of meeting these new requirements.  The prosecution's gang expert described

two predicate offenses by 18th Street gang members: a 2010 conviction for assault with a firearm and a 2008 conviction (more than three years prior to the July 2012 shooting and related crimes) for witness intimidation and extortion. The Attorney General concedes this evidence did not establish the requirements for two predicate offenses as specified in Assembly Bill 333.

The gang expert also provided his opinion, in response to a hypothetical question, that the crimes against Vargas were committed for the benefit of, and in association with, the 18th Street gang. In discussing the benefit to the gang, the expert explained respect to gang members means everything: "[W]hen they feel disrespected, then it's not just individual, it's the 18th Street as a whole gang that is disrespected." The shooting of Vargas demonstrated gang members meant business, the expert continued, which would lead to fear in the gang's rivals. That testimony, the Attorney General acknowledges, falls short of proving the attempted extortion and shooting of Vargas were done to benefit, promote, further or assist the gang in a way that was more than reputational.

If the prosecution elects to retry the attempted murder or the conspiracy charges against Jojola and Sanchez, it will be required to meet the new requirements of section 186.22 to prove the gang enhancement allegations for those crimes. (Because it was Morales, not Jojola or Sanchez, who fired a gun killing Vargas, it was the true finding on the gang enhancement that authorized imposition of a 25-year-to-life firearm enhancement on their attempted murder convictions, pursuant to section 12022.53, subdivisions (d) and (e)(1).) However, the attempted extortion and false imprisonment convictions, which

14

are unchallenged on appeal, also included criminal street gang enhancements. Because the evidence at trial failed to satisfy all the new requirements for a criminal street gang enhancement, we reverse the true findings on the enhancements as to those counts as well, and remand to permit the prosecution to retry them if it elects to do so. (See *People v. E.H.*, *supra*, 75 Cal.App.5th at p. 478; *People v. Eagle* (2016) 246 Cal.App.4th 275, 280 ["[w]hen a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand"]; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 71-72, fn. 2 [same]; see also *People v. Chiu, supra*, 59 Cal.4th at p. 168.)

### 3. *Prejudicial Instructional Error Requires Reversal of the Convictions for Conspiracy To Commit Murder*

Jojola, Sanchez, Morales and Quesada were each charged with conspiracy to commit the murder of Vargas. As to this count the trial court instructed the jury using a variant of CALJIC No. 8.69. The default phrasing of CALJIC No. 8.69 reflects the twin specific intent requirements for conspiracy to commit a particular offense, specifying that "[e]ach of the persons specifically intended to enter into an agreement with one or more other persons for that purpose," and that "[e]ach of the persons to the agreement harbored express malice aforethought, namely a specific intent to kill unlawfully another human being." (See *People v. Swain* (1996) 12 Cal.4th 593, 600 ["'Conspiracy is a "specific intent" crime. . . . The specific intent required divides logically into two elements: (a) the intent to agree, or conspire, and (b) the intent to commit the offense which is the object of the conspiracy. . . . To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the

15

conspirators intended to agree but also that they intended to commit the elements of that offense,'" italics omitted].)

As read to the jury, however, the instruction in this case stated in part, "In order to prove this crime, each of the following elements must be proved:  1. Two or more persons entered into an agreement to kill unlawfully another human being; 2. At least two of the persons specifically intended to enter into an agreement with one or more other persons for that purpose; 3. At least two of the persons to the agreement harbored express malice aforethought, namely a specific intent to kill unlawfully another human being; and 4. An overt act was committed in this state by one or more of the persons who agreed and intended to commit murder."  In their original appeal Jojola and Sanchez argued, in so instructing the jury, the court committed prejudicial error by failing to include the requirement that the jury must find that each of them, not just any two of the coconspirators, intended to kill Vargas.  As we have held twice before, they are correct (a conclusion the Attorney General does not dispute in the current appeal).

As the Supreme Court held in *People v. Garton* (2018) 4 Cal.5th 485, 516, asking the jury to find specific intent for "at least two" conspirators in a conspiracy with more than two members, none of whom is feigning involvement, is error because it "could potentially lead a jury to find an individual conspirator guilty without finding that he or she possessed a specific intent to agree or to kill."  (See *People v. Petznick* (2003) 114 Cal.App.4th 663, 681 [same erroneous CALJIC No. 8.69 instruction "permitted the jury to find defendant guilty of conspiracy to commit murder without regard to whether or not he

16

personally intended to kill so long as they found that at least two of the other participants harbored that intent"].)[3]

Because each defendant's specific intent to commit murder was an essential element of the charged conspiracy offense, we assess whether the instructional error was harmless under the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24. (See *People v. Brooks* (2017) 3 Cal.5th 1, 69 ["'[m]isdescription of an element of a charged offense is subject to harmless error analysis and does not require reversal if the misdescription was harmless beyond a reasonable doubt'"]; see also *People v. Aledamat, supra*, 8 Cal.5th at p. 11 ["the same *Chapman* analysis of harmless error applies to alternative-theory error as applies to other kinds of misdescription of the elements"].) That is, Jojola's and Sanchez's convictions for

---

[3] The written version of the instruction contained in the clerk's transcript on appeal read, "In order to prove this crime, each of the following elements must be proved: [¶] 1. Two or more persons entered into an agreement to kill unlawfully another human being; [¶] 2. *Each At least* two of the persons specifically intended to enter into an agreement with one or more other persons for that purpose; [¶] 3. *Each At least* two of the persons to the agreement harbored express malice aforethought, namely a specific intent to kill unlawfully another human being; and [¶] 4. An overt act was committed in this state by one or more of the persons who agreed and intended to commit murder." (Italics added.)

Although the written version of an instruction generally governs if there is a conflict between oral and written instructions (see *People v. Osband* (1996) 13 Cal.4th 622, 717), the written instruction here did nothing to correctly inform the jury that the "each" language, not the "at least two" language, applied.

17

conspiracy to commit murder must be reversed "unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict." (*People v. Chun* (2009) 45 Cal.4th 1172, 1201.)

"[I]n order to conclude that an instructional error '"did not contribute to the verdict"' within the meaning of *Chapman* [citation], we must '"find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record."'" (*People v. Brooks*, *supra*, 3 Cal.5th at p. 70.) The incorrect phrasing of CALJIC No. 8.69 here, which permitted the jury to find Jojola and Sanchez guilty of conspiracy to commit murder without regard to whether they personally intended to kill Vargas, was far from unimportant. Indeed, the jury was also instructed pursuant to CALJIC No. 6.11 that a member of a conspiracy "is not only guilty of the particular crime that to his knowledge his confederates agreed to and did commit, but is also liable for the natural and probable consequences of any crime [or] act of a co-conspirator to further the object of the conspiracy, even though that crime [or] act was not intended as a part of the agreed upon objective and even though he was not present at the time of the commission of that crime [or] act"—thereby reinforcing the erroneous concept that Jojola and Sanchez could be guilty of conspiracy to commit murder even if they did not intend to kill Vargas because they conspired with Morales and Quesada to extort money from the victim.

The evidence that Jojola and Sanchez agreed with the plan for Morales to kill Vargas, although sufficient to support their conspiracy convictions as tried, was not so overwhelming that we can say, beyond a reasonable doubt, the jury verdict would have been the same had it been properly instructed. (See *People v.*

18

*Gonzalez* (2012) 54 Cal.4th 643, 666 [appropriate test to determine whether an instruction that erroneously omitted an element of an offense was harmless is whether the record establishes beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error]; *People v. Mil* (2012) 53 Cal.4th 400, 417 [reviewing the record to determine if "the record supports a reasonable doubt as to [the omitted] element" of the offense].)  Accordingly, the conspiracy convictions must also be reversed.

## DISPOSITION

The judgment and Jojola's and Sanchez's convictions for conspiracy to commit murder and attempted willful, deliberate and premeditated murder, together with the associated criminal street gang and firearm-use enhancements, are reversed. Their convictions for attempted extortion and false imprisonment are affirmed but the related true findings on the criminal street gang enhancement are reversed.  The cause is remanded to provide the People an opportunity to retry Jojola and Sanchez, or either of them, on legally viable theories of conspiracy to commit murder and attempted murder and to retry the criminal street gang enhancements.  If the People elect not to do so, Jojola and Sanchez are to be resentenced in a manner that is consistent with this opinion.


PERLUSS, P. J.

We concur:


SEGAL, J.                    FEUER, J.